IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOAN FAULKNER SMITH, | § | |
| Individually and as Independent | § | |
| Administrator of the Estate of | § | |
| JACKY RAY SMITH; BRADLEY | § | |
| SMITH; and MOLLIE BEERS | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:11-CV-0356-K |
| | § | |
| DAIMLER TRUCKS NORTH AMERICA, | § | |
| LLC and PENSKE TRUCK LEASING CO., | § | |
| L.P. | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' TRIAL BRIEF
REGARDING APPLICABILITY OF SECTION 82.008 OF THE
TEXAS CIVIL PRACTICES & REMEDIES CODE**

# TABLE OF CONTENTS

I.    Background ................................................................................................. 1

II.   Summary of Arguments ............................................................................. 2

III.  Arguments and Authorities ....................................................................... 3

      A.    Federal Motor Carrier Safety Regulations govern risk of harm at issue ................ 3

            1.    History of FMCSA and FMCSR ................................................ 4

            2.    FMCSR 393.65 and 393.67 specifically regulate fuel system safety .......... 5

            3.    Plaintiffs' narrow interpretation of "product risk" is untenable ................... 7

            4.    Experts confirm that FMCSR addresses the product risk at issue ............. 10

      B.    Plaintiffs Have Not Rebutted the §82.008 Presumption ........................................ 11

      C.    Section §82.008 is a proper question for the jury .................................................. 13

      D.    Even if No Presumption, FMCSR is Admissible at Trial ...................................... 14

IV.   Conclusion ................................................................................................ 15

i

## TABLE OF AUTHORITIES

**CASES**

*Bic Pen Corp. v. Carter*.  171 S.W.3d 657, 667 (Tex.App.—Corpus Christi 2005) rev'd ........... 13

*Bristol-Myers Co. v. Gonzales,* 548 S.W.2d 416, 423 (Tex. Civ. App.—Corpus Christi 1976), *rev'd on other grounds,* 561 S.W.2d 801, 804 (Tex.1978) .................................................... 14, 15

*Bruce v. Martin-Marietta Corp.*, 544 F.2d 442, 446 (10th Cir. 1976) (Maryland law) .............. 15

*Dorsey v. Honda Motor Co.*, 655 F.2d 650, 656 (5th Cir.1981), *modified on rehearing,* 670 F.2d 21 (1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) ........................... 15

*Ellis v. K-Lan Co., Inc.,* 695 F.2d 157 (5th Cir. 1983) ................................................. 14

*Howard v. McCrory Corp.,* 601 F.2d 133, 138 (4th Cir.1979) .................................................. 15

*Poches v. J.J. Newberry Company,* 549 F.2d 1166, 1168 (8th Cir.1977) .................................... 15

*Raymond v. Riegel Textile Corp.*, 484 F.2d 1025, 1027 (1st Cir. 1973) (New Hampshire law) ..15

*Rucker v. Norfolk & Western Railway,* 77 Ill.2d 434, 439-40, 33 Ill.Dec. 145, 147-48, 396 N.E.2d 534, 536-37 (1979) ..................................................................................... 15

*Rumsey v. Freeway Manor Minimax,* 423 S.W.2d 387, 394 (Tex. Civ. App.—Houston [1st Dist.] 1968, no writ)… ................................................................................................ 15

*Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975) (North Carolina law) ....... 15

*Schwartz v. American Honda Motor Co., Inc.,* 710 F.2d 378 (Ill. 1983) .................................... 15

*Simien v. S.S. Kresge Company,* 566 F.2d 551, 557 (5th Cir. 1978) ......................................... 15

*Wright v. Ford,* 508 F.3d 263 (5th Cir. 2007) ......................................................... 9, 10, 12, 13, 14

**RULES**

49 Code of Federal Regulations 1.73(1).......................................................................... 2, 5

Federal Motor Carrier Safety Regulations 393.65 ................................... 2, 3, 5, 7, 8, 9, 11, 12, 15

Federal Motor Carrier Safety Regulations 393.67 ............................. 2, 3, 5, 6, 7, 8, 9, 11, 12, 15

Federal Motor Vehicle Safety Standard 111 ..................................................................... 9, 10

Texas Civil Practice and Remedies Code §82.008 ................1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15

49 United States Code 31502(b) ..........................................................................................5

49 United States Code 113 ..................................................................................................4

**OTHER AUTHORITIES**

http://www.fmcsa.dot.gov/safety-security/safety-security.htm ......................................................4

httm:fmcsa.dot.gov/about/aboutus.htm .....................................................................................4

Restatement (Second) of Torts s 288C..........................................................................................15

W. Prosser, Handbook of the Law of Torts s 36 at 203-04 (4th ed. 1971) ...................................15

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendants Penske Truck Leasing Co., L.P. and Daimler Trucks North America, LLC ("Defendants") and file this response to Plaintiffs' Trial Brief Regarding Applicability of Section 82.008 of the Texas Civil Practices & Remedies Code and, in support thereof, Defendants would respectfully show the following:

## I. Background.

This case arises from a single vehicle crash that occurred at 8:42 p.m. on July 6, 2008 when Jacky Ray Smith ("Smith" or "the decedent") lost control of the 2006 Freightliner truck ("the Truck") he was driving. While traveling in the northbound lanes of I-35E near Red Oak, Texas, Smith failed to maintain his lane of traffic, crossed to the left and impacted a "Jersey Barrier" dividing the highway, after which the Truck moved to the right, traveled approximately 1,000 feet across all lanes of travel (a period of about 13 seconds), and impacted a string of six concrete barriers on the other (right) side of the highway. After the second impact with right side concrete barriers, the Truck slid across the top of the concrete barriers and came to rest on the driver's side. A fire occurred in the course of the collision and ultimately consumed the tractor. After the fire was extinguished, Smith's body was found among the burned remains of the Truck. The remains of the burned truck were not preserved for inspection by any of the remaining parties to the case.

Plaintiffs have filed claims against Daimler Trucks North America, LLC, the manufacturer of the Truck, and Penske Truck Leasing Co., L.P., the owner of the Truck.[1] Plaintiffs' Amended Complaint, filed on October 21, 2011, asserts claims for negligence, strict products liability and gross negligence against Defendants.

---

[1] Penske leased the Truck to Annona, who was previously a defendant in this lawsuit. Annona was non-suited on December 17, 2010 following a settlement with the Plaintiffs.

## II. Summary of Arguments.

In their trial brief, "Plaintiffs claim that the risk of fuel tanks [sic] compromise or rupture was created by DTNA's placement of the fuel tanks within the 'zone of danger.'" *See* Plaintiffs' Trial Brief (Doc. 155) at p. 1. Defendants claim that pursuant to Texas Civil Practices & Remedies Code Section 82.008 they are entitled to a rebuttable presumption that the fuel tank was not defective because it complied with all applicable government regulations. *See* Defendants' Answer to Plaintiffs' Amended Complaint (Doc. 42) at p. 9. Plaintiffs argue Section 82.008 is inapplicable because there is no regulation that applies to the risk that caused the harm in this case, and Plaintiffs define the risk as "fuel tank rupture/compromise *as a result of front tire impact.*" (Doc. 155) at p. 2 (emphasis added). Plaintiffs also state if any regulation does apply, it is undisputed the regulations are inadequate to protect the public from unreasonable risk of injury caused by fuel tank placement. *Id.* Lastly, Plaintiffs argue that Section 82.008 should not be considered by the jury.

Plaintiffs' Trial Brief must be denied because 1) Federal Motor Carrier Safety Regulations ("FMSCR") 393.65 and 393.67,[2] regulate the exact product risk at issue in this litigation (fuel tank compromise); 2) Plaintiffs have failed to rebut the Section 82.008 presumption; and 3) Section 82.008 is a proper question for the jury.

The design of the fuel system at issue in this litigation is regulated by FMCSR 393.65 and 393.67 and must conform to those requirements. *See* expert report of Bruce Koepke (expert regarding design, manufacture, testing and performance of the Truck), attached hereto as Exhibit "A" at p. 4; expert report of Frank Entwisle (expert mechanical engineer regarding design, manufacture, testing and performance of the fuel system of the Truck), attached hereto as Exhibit

---

[2] Parts 350–399 of Chapter 49 of the Code of Federal Regulations are also known as the Federal Motor Carrier Safety Regulations.

"B" at p. 3. Placement of fuel tanks outboard of the rails (as in the subject vehicle) is specifically authorized given compliance with the listed requirements in FMCSR 393.65 and 393.67. *Id.* Daimler Trucks conducted numerous tests to ensure that the fuel system in the subject vehicle met or exceeded all applicable government and industry safety requirements. Exhibit "A" at pp. 4-6; Exhibit "B" at p. 3.

FMCSR 393.65 and 393.67 govern exactly the product risk that allegedly caused the harm in this litigation, namely the risk of fuel tank compromise, and because the fuel system at issue met and even exceeded the FMCSR regulations addressing this product risk, Defendants are entitled to submit to the jury their rebuttable presumption that the subject fuel system was not defective. Despite Plaintiffs' feeble arguments to the contrary, they have not met their burden to rebut this presumption as they fail to put forth any substantive evidence showing that FMCSR 393.65 and 393.67 were inadequate to protect the public from unreasonable risks of injury or damage.    In addition, the application of Section 82.008 is clearly within the realm of consideration by the jury, as previously determined by federal courts addressing the issue.

III. <u>Argument and Authorities.</u>

A.    <u>Federal Motor Carrier Safety Regulations govern risk of harm at issue.</u>

Plaintiffs' Trial Brief should be denied because Defendants have presented conclusive evidence that the fuel system it designed and manufactured met applicable government safety standards, including FMSCR 393.65 and 393.67, giving rise to a presumption that the fuel system was not defective.[3]   The Texas Legislature enacted Section 82.008 of the Civil Practice and Remedies Code to give product manufacturers a presumption that a product is safe if it meets

---

[3] Notably, Plaintiffs' Trial Brief does not argue that the fuel system at issue did not comply with federal regulations as they admit "the tractor complied with all applicable federal regulations." (Doc. 155) at p. 5. Rather, the legitimacy of Plaintiffs' Trial Brief is based entirely on the position that FMCSR 393 does not apply to "the risk of fuel tank rupture/compromise as a result of frontal impact." *Id.* at p. 2.

3

government sponsored safety standards. This presumption applies when a safety standard governs "the product risk that allegedly caused harm." TEX. CIV. PRAC. & REM. CODE §82.008(a).

1.     History of FMCSA and FCSCR.

By its very name, the Federal Motor Carrier Safety Administration ("FMCSA") is focused on safety. The FMCSA, "in cooperation with its partners and customers, strives to reduce crashes, injuries and fatalities involving large trucks and buses." http://www.fmcsa.dot.gov/safety-security/safety-security.htm. The FMCSA was established within the Department of Transportation on January 1, 2000, pursuant to the Motor Carrier Safety Improvement Act of 1999 (49 U.S.C. 113):

> Formerly a part of the Federal Highway Administration, ***the Federal Motor Carrier Safety Administration's primary mission is to prevent commercial motor vehicle-related fatalities and injuries***. Activities of the Administration contribute to ***ensuring safety in motor carrier operations through strong enforcement of safety regulations***; targeting high-risk carriers and commercial motor vehicle drivers; ***improving safety information systems and commercial motor vehicle technologies; strengthening commercial motor vehicle equipment and operating standards; and increasing safety awareness***. To accomplish these activities, the Administration works with Federal, State, and local enforcement agencies, the motor carrier industry, labor safety interest groups, and others.
>
> ***Regulatory Compliance and Enforcement. The Administration operates a program to improve safety performance and remove high-risk carriers from the Nation's highways***.

*See* http://www.fmcsa.dot.gov/about/aboutus.htm (emphasis added). As stated above, the primary mission of the FMCSA is to "***prevent commercial motor vehicle-related fatalities and injuries***" and "***ensuring safety in motor carrier operations through strong enforcement of safety regulations***." *Id.* (emphasis added). There can be no argument that the FMCSA's focus is on the safety of commercial motor vehicles.

4

2.     <u>FMCSR 393.65 and 393.67 specifically regulate fuel system safety</u>.

FMCSR 393.65 and 393.67 were enacted pursuant to the express grant of power provided by the United States Code for the Secretary of the Department of Transportation to "prescribe requirements for . . . *safety of operation and equipment* of, a motor carrier . . . and standards of equipment of, a motor private carrier, when needed *to promote safety of operation*." 49 U.S.C. 31502(b) (emphasis added).   Pursuant to these U.S. Code provisions, the Code of Federal Regulations specifically provide that the Administrator of the Federal Motor Carrier Safety Administration is delegated authority to "Carry out 49 U.S.C. 31502 relating generally to . . . *safety of operation and equipment of motor carriers*. . . ."49 CFR 1.73(l) (emphasis added). Pursuant to these authorizations, the Federal Motor Carrier Safety administration promulgated Section 393, *Parts and Accessories Necessary for Safe Operation*, and specifically Sections 393.65 and 393.67 which provide for safety standards related to vehicle fuel systems:

393.65
All fuel systems.

(a) *Application of the rules in this section.* The rules in this section apply to systems for containing and supplying fuel for the operation of motor vehicles or for the operation of auxiliary equipment installed on, or used in connection with, motor vehicles.
(b) *Location.* Each fuel system must be located on the motor vehicle so that—
(1) No part of the system extends beyond the widest part of the vehicle;
(2) No part of a fuel tank is forward of the front axle of a power unit;
(3) Fuel spilled vertically from a fuel tank while it is being filled will not contact any part of the exhaust or electrical systems of the vehicle, except the fuel level indicator assembly;
(4) Fill pipe openings are located outside the vehicle's passenger compartment and its cargo compartment;
(5) A fuel line does not extend between a towed vehicle and the vehicle that is towing it while the combination of vehicles is in motion; and
(6) No part of the fuel system of a bus manufactured on or after January 1, 1973, is located within or above the passenger compartment.
(c) *Fuel tank installation.* Each fuel tank must be securely attached to the motor vehicle in a workmanlike manner. . . .

§ 393.67
Liquid fuel tanks.

(a) *Application of the rules in this section.* The rules in this section apply to tanks containing or supplying fuel for the operation of commercial motor vehicles or for the operation of auxiliary equipment installed on, or used in connection with commercial motor vehicles.
(1) A liquid fuel tank manufactured on or after January 1, 1973, and a side-mounted gasoline tank must conform to all rules in this section. . .

(d) *Liquid fuel tank tests.* Each liquid fuel tank must be capable of passing the tests specified in paragraphs (d)(1) and (2) of this section. The specified tests are a measure of performance only. Alternative procedures which assure that equipment meets the required performance standards may be used. .
(1) *Safety venting system test*—(i) *Procedure.* Fill the tank three-fourths full with fuel, seal the fuel feed outlet, and invert the tank. When the fuel temperature is between 50 °F. and 80 °F., apply an enveloping flame to the tank so that the temperature of the fuel rises at a rate of not less than 6 °F. and not more than 8 °F. per minute.
(ii) *Required performance.* The safety venting system required by paragraph (c)(8) of this section must activate before the internal pressure in the tank exceeds 50 pounds per square inch, gauge, and the internal pressure must not thereafter exceed the pressure at which the system activated by more than five pounds per square inch despite any further increase in the temperature of the fuel.
(2) *Leakage test*—(i) *Procedure.* Fill the tank to capacity with fuel having a temperature between 50 °F. and 80 °F. With the fill-pipe cap installed, turn the tank through an angle of 150° in any direction about any axis from its normal position.
(ii) *Required performance.* Neither the tank nor any fitting may leak more than a total of one ounce by weight of fuel per minute in any position the tank assumes during the test.
(e) *Side-mounted liquid fuel tank tests.* Each side-mounted liquid fuel tank must be capable of passing the tests specified in paragraphs (e)(1) and (2) of this section and the test specified in paragraphs (d)(1) and (2) of this section. The specified tests are a measure of performance only. Alternative procedures which assure that equipment meets the required performance criteria may be used.
(1) *Drop test*—(i) *Procedure.* Fill the tank with a quantity of water having a weight equal to the weight of the maximum fuel load of the tank and drop the tank 30 feet onto an unyielding surface so that it lands squarely on one corner.
(ii) *Required performance.* Neither the tank nor any fitting may leak more than a total of 1 ounce by weight of water per minute.
(2) *Fill-pipe test*—(i) *Procedure.* Fill the tank with a quantity of water having a weight equal to the weight of the maximum fuel load of the tank and drop the tank 10 feet onto an unyielding surface so that it lands squarely on its fill-pipe.
(ii) *Required performance.* Neither the tank nor any fitting may leak more than a total of 1 ounce by weight of water per minute.

6

FMCSR 393.65 and 393.67, attached fully as Exhibit "C." Based on the history of the FMCSA and the express requirements of the above-cited regulations, there can be no other purpose than safety for the existence of such regulations and any argument to the contrary is nonsensical.

      3.    <u>Plaintiffs' narrow interpretation of "product risk" is untenable.</u>

Because FMCSR 393.65 and 393.67 address fuel tank compromise, including the risks of fire and leaks in fuel tanks as a result of impact (the exact issues in this litigation), in an attempt to avoid the §82.008 presumption, Plaintiffs' Trial Brief creatively attempts to dismiss FMCSR 393's applicability by narrowly defining the product risk as "fuel tank rupture/compromise *as a result of front tire impact*." (Doc. 155) at p. 2 (emphasis added). This argument is disingenuous because the actual product risks sought to be encompassed by FMCSR 393.65 and 393.67 are clearly much broader so as to promote safety and prevent fuel tank compromise regardless of the specific mode of impact. Plaintiffs' attempt to define the product risk as fuel tank rupture or compromise caused by "*front tire impact*" is insupportably narrow.

The wording of the individual FMCSR fuel system standards confirms that they are intended to regulate the safety of fuel tanks during a crash or impact and prevent fuel tank spills and fire as the regulations address:

> -tank placement (cannot extend beyond widest part of vehicle 393.65(b)(1), no part of tank can be forward of the front axle of a power unit 393.65(b)(2), vertically spilled fuel while filling cannot contact any part of the exhaust or electrical systems 393.65(b)(3));

> -fill pipe openings (must be located outside the vehicle's passenger and cargo compartments 393.65(b)(5), etc.);

> -fuel tank installation (each fuel tank must be securely attached to the vehicle 393.65(c));

> -prohibition of gravity or siphon feed (393.65(d));

> -protection of fuel lines (393.65(f));

-construction of fuel tanks (joints must be heat resistant and mechanically secure 393.67(c)(1));

-fittings, threads (regulated by engineering standards 393.67(c)(2)-(3));

-drains and bottom fittings (must be protected against damage from impact 393.67(c)(4));

-fill pipes (must minimize risk of fuel spillage during fueling operations and when the vehicle is involved in a crash 393.67(c)(7));

-safe venting system (venting system must, in the event the tank is subjected to fire, prevent internal tank pressure from puncturing the tank's body, seams, or bottom opening 393.67(c)(8));

-pressure resistance (body and fittings must be capable of withstanding certain maximum internal pressure 393.67(c)(9));

-air vent (must be equipped with nonspill air vent 393.67(c)(10));

-markings (must be marked with warning against filling more than 95 percent of its capacity 393.67(c)(11));

-overfill restriction (must be designed and constructed so that it cannot be filled more than 95 percent of its capacity and normal expansion of the fuel will not cause fuel spillage 393.67(c)(12)); and

-liquid fuel tank tests (must meet numerous performance standards addressing the safety venting system, leakage test, drop test, fill pipe tests 393.67(d)).

Exhibit "C." None of these standards are tied to a single particular crash mode (such as by a front tire impact), but rather are expressed in terms of protecting against a variety of accident risks, including the issues underlying the subject crash (impact, fire, tank placement, etc.). *Id.* In addition, the numerous required tests seek to confirm the tank will not heat to a dangerous temperature or leak fuel in the event of an accident. *Id.*

Ultimately, this Court must decide how the term "product risk" should be characterized within the context of §82.008 and FMCSR 393. Plaintiffs are inappropriately focused on a very narrow interpretation: "fuel tank rupture/compromise *as a result of front tire impact*" in an effort to avoid §82.008. (Doc. 155) at p. 2 (emphasis added). If this Court permits Plaintiffs to define

the "product risk" to require a particular crash mode, such as "front tire impact," it will allow litigants to end run the State Legislature's intent by using discrete wording of their pleadings alone to evade application of the statute. The stage would be set for claimants everywhere to bypass the §82.008 presumption by narrowly defining the "product risk" at issue to make it seem beyond the purview of any safety standard. It would also directly contradict the Federal Motor Carrier Safety Administration's goals and responsibilities to regulate the more general product risks addressed by FMCSR standards as well as the language of 393.65 and 393.67 which specifically address the risks related to fuel systems. That is not and cannot be the law in Texas. In fact, the Fifth Circuit has rejected similar attempts to narrowly define a "product risk" to avoid the §82.008 presumption in a case directly on point. *Wright v. Ford*, 508 F.3d 263 (5th Cir. 2007).

In *Wright*, the Fifth Circuit considered a case in which a child was hit by an Expedition moving in reverse in a parking lot. 508 F3d at 269. The Wrights claimed that the Expedition was defective because it was sold without an ultrasonic reverse sensing system. *Id.* at 268. They also claimed that the jury should not have received an instruction on §82.008 because they argued that FMVSS 111, titled "Rearview mirrors" did not govern the product risk involved in the case. *Id.* at 269. The Fifth Circuit disagreed with the Wrights and found that they were not entitled to limit the application of FMVSS 111 to the issue of rearview mirror performance and placement. *Id.* Rather, the Court found that FMVSS 111 should be interpreted more broadly and that its purpose was to "reduce the number of injuries and deaths 'that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed view to the rear.'" *Id.*

Plaintiffs' characterization of the product risk in this case stands in stark contrast to the Fifth Circuit's broad definition of the product risk in the *Wright* opinion. In that case, the Court

found that FMVSS 111 was intended to reduce injuries and deaths due to an inadequate view to the rear of the vehicle without regard for the specific mode of injury (improper placement of the rear view mirror vs. ultrasonic reverse sensing system).  Likewise, FMCSR 393 is intended to ensure the safety of fuel tanks during a crash or impact and prevent fuel tank spills and fire, among other risks, without regard for the specific mode of injury (such as a front tire impact).

The Fifth Circuit's analysis in the *Wright* case is equally applicable here.  Just as the *Wright* plaintiffs were unable to avoid the §82.008 presumption by focusing on a narrowly defined product risk, the plaintiffs in this case cannot avoid the §82.008 presumption by artificially narrowing the risk to a specific type of impact.  The plaintiffs' contention that FMCSR standards must address a front tire impact to a fuel tank to be relevant to this case is simply wrong.

4.      Experts confirm that FMCSR 393 addresses the product risk at issue.

Plaintiffs' own expert affirms that the FMCSA regulations are applicable to the fuel system at issue in this litigation:

> Q. There are governmental regulations regarding the fuel system on this truck, correct?
> A. Yes.
> Q. And as far as you know, the truck complied with them?
> A. It's a self-confirming compliance, with testing and information to back it up.  I would be surprised if the truck did not comply with it.
>
> Q.  Anyway, as we sit here today, your belief is that this fuel system complied with government requirements and regulations, correct?
> A. As I said, I'd be surprised if it didn't.  I guess that's an indirect answer.  Yes.
> Q. "Yes" is the direct answer?
> A. Yeah, "yes" is the direct answer.  Thank you.

*See* excerpts from deposition of Frederick Arndt at p. 97:15-22, 98:8-14, attached hereto as Exhibit "D."  Arndt also acknowledges that the FMCSR regulations address such safety issues as the welding of tanks, openings for the filler and fuel lines, etc.  *Id.*  99:1-24.    Additionally,

Defendant's retained expert Frank Entwisle confirms that FMCSR 393 regulates the product risk at issue in this case:

> Motor Carrier Safety Regulations at 49 CFR Subpart E outline the requirements for fuel system for heavy highway trucks. These Regulations specify design features and performance such as tank placement, fuel line routings, fuel tank construction, types of fittings, fill pipe construction, venting systems, pressure resistance, and drop test performance.
>
> Testing to confirm meeting these performance criteriae was required by Freightliner to be performed successfully which includes subjecting the fuel tank to an enveloping flame, drop tests of 31 feet on the corner and 11 feet onto the fill pipe, and internal pressurization. In addition to such tests, Freightliner has performed various full scale frontal crash tests which resulted in changes to truck design to improve truck crashworthiness.

Exhibit "B," at p. 3.   Similarly Defendants' expert Bruce Koepke states in his report:

> The industry is regulated in operations and vehicle design. Fuel systems are regulated under FMCSR 395.65 [sic], and must conform to the requirements therein. Placement of tanks outboard of the rails is specifically authorized, given compliance with the listed requirements. Freightliner/DTNA conducts tests to ensure that fuel systems meet or exceed all applicable government and industry safety requirements. Beyond complying with government and industry standards, DTNA routinely evaluates and works to improve the safety of fuel systems on the vehicles.

Exhibit "A," at p. 4.   Based on the myriad support provided above, Defendants request that the Court deny Plaintiffs' Trial Brief because Defendants have conclusively shown that the fuel system Daimler Trucks designed and manufactured met applicable government safety standards, including FMSCR 393.65 and 393.67, and that such standards govern the product risk at issue, giving rise to a presumption that the fuel system was not defective.

B.    Plaintiffs Have Not Rebutted the §82.008 Presumption.

Plaintiffs have not met their burden to rebut the presumption that the fuel system at issue was not defective. There are two ways in which a §82.008 presumption may be defeated:

(b) The claimant may rebut the presumption in Subsection (a) by establishing that:

(1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or

(2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action.

TEX. CIV. PRAC. & REM. CODE §82.008(b).  Apart from Plaintiffs' conclusory allegations, they have produced no evidence that would be admissible at trial to support the position that FMSCR 393.65 and 393.67 are inadequate to protect the public or that Defendants withheld any information from the government.

Plaintiffs strangely state that it is "undisputed that the regulations are inadequate to protect the public from the unreasonable risk of harm because designs that comply with the regulations can still be unreasonably dangerous." (Doc. 155) at p. 6.  The only proof that Plaintiffs point to in support of their assertion that FMCSR 393.65 and 393.67 are inadequate is the testimony of Defendants' expert Frank Entwisle who testified that it may be *possible* "to design an unreasonably dangerous fuel tank that met the federal regulations. . ." (Doc. 155) at p. 7.  Plaintiffs then take an illogical leap to state that based on this, "the regulations are inadequate for protecting the public from unreasonable risk of harm." *Id.* at p. 8.  The truth is, Entwisle never testified that the FMCSR are inadequate for protecting the public and pointing to Entwisle's testimony that a FMCSR compliant design *could be* dangerous falls far short of rebutting the 82.008 presumption.  The Court in the *Wright* case specifically addressed the burden of proof associated with the 82.008 rebuttal and held that:

> The statute provides that the "claimant may rebut the presumption in subsection (a) by *establishing* that ... [the applicable federal standards] were inadequate." Section 82.008(b) (emphasis added). *"Establish" connotes something more than simply introducing some evidence from which a factfinder might-or might not-find that which is to be "established."*

*Id.* at 273-274 (emphasis added). Here, Plaintiffs' "assertedly rebutting evidence" that they were able to induce Defendants' expert to vaguely agree that some hypothetical design scheme could comply with FMCSR 393 and still be dangerous hardly meets the rigorous burden as described by the Fifth Circuit to go beyond the simple introduction of evidence and actually "establish" that the FMCSR 393 standards fail to protect the public.

C.       Section 82.008 is a proper question for the jury.

Plaintiffs argue that the presumption created by Section 82.008 is a "bursting bubble" presumption to be "submitted to the Trial court at a pre-trial hearing." (Doc. 155) at p. 3. The only case Plaintiffs cite for this proposition is *Bic Pen Corp. v. Carter*. 171 S.W.3d 657, 667 (Tex.App.—Corpus Christi 2005) rev'd, 251 S.W.3d 500 (Tex.2008). Plaintiffs tell the Court that this case "suggested that Section 82.008 created a 'bursting bubble'-type presumption." (Doc. 155) at p. 3. Plaintiffs' citation of the *Bic* case for this holding or even this "suggestion" is disingenuous. In fact, nowhere in the *Bic* case does the Court even consider Section 82.008 and the presumption created therein because 82.008 did not apply to the plaintiffs' claims (filed before its enactment). *Bic,* 171 S.W.3d at 607. Plaintiffs' reliance on this case is absurd. In addition to citing a case which in no way supports their argument, Plaintiffs cite *Wright v. Ford* for the position that:

> [A] court typically is responsible for applying the 'bursting bubble' type of presumption, while a jury typically decides whether a Morgan presumption has been rebutted *Wright v. Ford Motor Co*., 506 F.3d at 273-763 [sic] Not surprisingly, most presumptions in Texas fall into the 'bursting bubble' category. *Id.* at fn 9.

(Doc. 155) at p. 3. What Plaintiffs conveniently fail to disclose to the Court is that the *Wright* decision specifically addressed this issue and held (in opposition to Plaintiffs' arguments) that:

> Given that the section 82.008(a) presumption is a statutory one, the language of

the statute would appear to control its operation. The statute provides that the "claimant may rebut the presumption in subsection (a) by *establishing* that ... [the applicable federal standards] were inadequate." Section 82.008(b) (emphasis added). "Establish" connotes something more than simply introducing *some* evidence from which a factfinder might-*or might not*-find that which is to be "established." *If, as here, the assertedly rebutting evidence is not such as to require as a matter of law that the federal standards be held inadequate, but rather presents a fact question in that respect, then, in a jury tried case, it appears logical to conclude that the statute proceeds on the assumption that any such fact question as whether the presumption has been rebutted will be submitted to the jury.*

*We conclude that it is not "clear or obvious" that the presumption provided for by section 82.008(a) and (b) is a Thayer type-rather than a Morgan type-presumption,* and accordingly the Wrights' contention, not properly preserved below, that the trial court erred by failing to treat the section 82.008 presumption as a Thayer-type (rather than a Morgan-type) presumption, does not present any plain error. Further, there is ample evidence (apart from any section 82.008 presumption) to sustain the verdict and certainly no clear indication that the verdict would probably have been different absent the section 82.008 instruction, and accordingly, even if the minimum standards to authorize reversal under the plain error standards were met, we would not exercise our discretion to do so because it does not appear that failure to address the claimed error would seriously affect the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 273-74 (emphasis added). As is evident by the Court's holding above, section 82.008 is neither clearly a Morgan nor Thayer type presumption and "whether the presumption has been rebutted *will be submitted to the jury.*" *Id.* (emphasis added). Therefore, Defendants request that the Court deny Plaintiffs' Trial Brief on this point and submit the issue regarding applicability of 82.008 to the jury for consideration.

D.    Even if No Presumption, FMCSR 393 is Admissible at Trial.

If this Court follows the suggestion of Plaintiffs' Trial Brief, the Defendants anticipate that Plaintiffs will seek to exclude any testimony regarding FMCSR 393 at trial on the grounds that it is not relevant. Any objection to the introduction of evidence regarding fuel system's compliance with FMCSR 393 must be overruled because it is well settled that compliance with applicable federal standards is relevant in a products liability case. *See Ellis v. K-Lan Co., Inc.,*

695 F.2d 157 (5th Cir. 1983); *Bristol-Myers Co. v. Gonzales,* 548 S.W.2d 416, 423 (Tex. Civ. App.—Corpus Christi 1976), *rev'd on other grounds,* 561 S.W.2d 801, 804 (Tex.1978); *Rumsey v. Freeway Manor Minimax,* 423 S.W.2d 387, 394 (Tex. Civ. App.—Houston [1st Dist.] 1968, no writ); *Simien v. S.S. Kresge Company,* 566 F.2d 551, 557 (5th Cir. 1978); *Howard v. McCrory Corp.,* 601 F.2d 133, 138 (4th Cir.1979); *Poches v. J.J. Newberry Company,* 549 F.2d 1166, 1168 (8th Cir.1977); *Schwartz v. American Honda Motor Co., Inc.,* 710 F.2d 378 (Ill. 1983); *Dorsey v. Honda Motor Co.,* 655 F.2d 650, 656 (5th Cir.1981), *modified on rehearing,* 670 F.2d 21 (1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Howard v. McCrory Corp.,* 601 F.2d 133, 138 (4th Cir.1979); *Rucker v. Norfolk & Western Railway,* 77 Ill.2d 434, 439-40, 33 Ill.Dec. 145, 147-48, 396 N.E.2d 534, 536-37 (1979); Restatement (Second) of Torts s 288C; W. Prosser, Handbook of the Law of Torts s 36 at 203-04 (4th ed. 1971); *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442, 446 (10th Cir. 1976) (Maryland law); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359, 1362 (4th Cir. 1975) (North Carolina law); *Raymond v. Riegel Textile Corp.,* 484 F.2d 1025, 1027 (1st Cir. 1973) (New Hampshire law). Thus, even if this Court determines that Defendants are not entitled to a presumption under §82.008, Defendants are still entitled to introduce evidence of the fuel system's compliance with FMCSR 393 during the trial of this matter.

## IV.  Conclusion.

Plaintiffs' Trial Brief Regarding Applicability of Section 82.008 of the Texas Civil Practices & Remedies Code must be denied because 1) Federal Motor Carrier Safety Regulations ("FMSCR") 393.65 and 393.67, regulate the exact product risk at issue in this litigation (fuel tank compromise); 2) Plaintiffs have failed to rebut the Section 82.008 presumption; and 3) Section 82.008 is a proper question for the jury.

WHEREFORE, PREMISES CONSIDERED, Defendants pray that this Court in all things deny Plaintiffs' Trial Brief and for any such other relief to which they may be entitled.

Respectfully submitted,

GERMER GERTZ BEAMAN & BROWN, L.L.P.

By:      /s/ Chris Pearson
         Chris Pearson
         State Bar No. 15690440

301 Congress Avenue Suite 1700
Austin, Texas 78701
512/472-0288
512/472-0721 – Fax

**COUNSEL FOR DEFENDANT DAIMLER TRUCKS
NORTH AMERICA, LLC**


By:      /s/ Mark Scudder
         Mark Scudder
         State Bar No. 17936300

Strasburger & Price, LLP
901 Main Street
Suite 4400
Dallas, Texas  75202
214/651-4300
214/659-4082 - Fax

**COUNSEL FOR PENSKE
TRUCK LEASING CO., LP**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure, and applicable Local Rules, on this the 6th day of June, 2012.

Peter A. Moir
Mathew J. Kita
Quilling, Selander, Cumminsky & Lownds, P.C.
2001 Bryan St., Suite 1800
Dallas, Texas 75208

J. Gregory Marks
Greg Marks
Guajardo & Marks, LLP
13355 Noel Road, Suite 1370
Dallas, Texas  75240
**COUNSEL FOR PLAINTIFFS**

_/s/ Chris Pearson_____
Chris Pearson